1

**SEYFARTH SHAW LLP**
Jon D. Meer (SBN 144389)

2
jmeer@seyfarth.com
2029 Century Park East, Suite 3500

3
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200

4
Facsimile:    (310) 201-5219

5

**SEYFARTH SHAW LLP**
John Giovannone (SBN 239366)

6
jgiovannone@seyfarth.com
Paul J. Leaf (SBN 261949)

7
pleaf@seyfarth.com
333 S. Hope Street, Suite 3900

8
Los Angeles, California 90071
Telephone:   (213) 270-9600

9
Facsimile:    (213) 270-9601

10
Attorneys for Defendant, Appellant, and Cross-Claimant
TATITLEK SUPPORT SERVICES, INC.

11

12

13
UNITED STATES DISTRICT COURT

14
CENTRAL DISTRICT OF CALIFORNIA

15

16
JAN NIAZI, a California resident,

17
                Plaintiff, Respondent, and
Cross-Defendant,

18
    v.

19
TATITLEK SUPPORT SERVICES, INC.,

20
an Alaskan Corporation,

21
                Defendant, Appellant, and
Cross-Claimant.

22

23

24

25

26

27

28

Case No. 2:15-cv-07403-SVW-JPRx

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Date:        January 8, 2018
Time:        1:30 p.m.
Ctrm:        10A

*[Filed concurrently with the Notice of Motion and Motion; the Declarations of Linda Beja and Jacob Lewis; the Statement of Uncontroverted Facts And Conclusions of Law; and [Proposed] Order]*

---

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

42853419v.1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   PROCEDURAL HISTORY ...............................................................................1

    A.    The Court Has Already Dismissed The Claims For Unpaid Wages Based On time Spent At The "Forward Operating Base" Where No Work Was Performed ...........................................................................................1

    B.    Plaintiff's Only Remaining Claims Relate To Alleged Work Performed "Off The Clock" Or "On-Call" While In The Simulated Villages.........................2

III.  PLAINTIFF WAS PAID FOR ALL TIME ACTUALLY "WORKED" WHILE AT THE SIMULATED VILLAGES.......................................................................2

    A.    Plaintiff Signed Written Employment Agreements Stating That He Would Accurately Record All Hours Worked .........................................................3

    B.    Plaintiff Signed Written Weekly Time Records Stating That He Must Correct Any Time Entries To Make Sure He Accurately Recorded All Hours Worked ........................................................................................................4

    C.    Plaintiff Routinely Corrected His Written Weekly Timesheets To Reflect Additional Hours Worked And Was Routinely Paid For The Extra Hours He Added ...........................................................................................................5

IV.   PLAINTIFF IS NOT ENTITLED TO ANY ADDITIONAL WAGES FOR ALLEGED HOURS WORKED OFF-THE-CLOCK WHILE AT THE SIMULATED VILLAGES BECAUSE HE FAILED TO REPORT IT ON HIS SIGNED WRITTEN TIMESHEETS .......................................................................6

    A.    Timesheets Signed And Certified By Employees Are Presumed To Be An Accurate Reflection Of Actual Hours Worked ...............................................6

    B.    Courts Have Routinely Granted Summary Judgment Against Claims For Unpaid Work Off The Clock, Where Employees Have Previously Signed And Certified Their Timesheets As To All Hours Worked ...........................7

    C.    Courts Have Routinely Granted Summary Judgment Against Claims For Unpaid Work Off The Clock, Even Though Employees Claim That The Employer Had Knowledge Of Off-The-Clock Work .....................................9

V.    PLAINTIFF IS NOT ENTITLED TO ANY ADDITIONAL WAGES FOR ALLEGED TIME SPENT ON-CALL WHILE AT THE SIMULATED VILLAGES BECAUSE THE APPLICABLE WAGE ORDER 5 LIMITS COMPENSABLE TIME TO ONLY TIME SPENT ACTUALLY WORKING ...10

    A.    The California Industrial Welfare Commission Has Issued Separate Wage Orders To Apply To Different Industries That Require Different Kinds Of Regulation ..................................................................................................10

i

B.  Wage Order 5 Applies To Any Employer Providing Meals, Housing, Or Maintenance Services, Either As Its Primary Business Or Incidental To Other Operations ...................................................................................11

C.  TSSI Is In The Business Of Providing Meals, Housing, And Maintenance Services, Either As Its Primary Business Or Incidental To Other Operations ...........................................................................................................13

    1.  TSSI Provided Meals To Marines At Simulated Villages.................13

    2.  TSSI Provided Housing To Marines At Simulated Villages.............14

    3.  TSSI Provided Maintenance For Simulated Villages.......................15

D.  As Provided Under Wage Order 5, Employees Are Paid Only For Time Spent Actually Working, But Not For Time Spent On-Call.......................16

VI.  PLAINTIFF IS NOT ENTITLED TO ANY ADDITIONAL WAGES FOR ALLEGED TIME SPENT ON-CALL WHILE AT THE SIMULATED VILLAGES BECAUSE WAGE ORDER 4 IS INAPPLICABLE..........................17

A.  There Are Two Types Of Wage Orders—"Industry Orders" And "Occupational Orders" .............................................................................18

B.  "Industry Orders" Preempt "Occupational Orders"......................................18

C.  Wage Order 5, Which Is An Industry Order, Preempts Wage Order 4, Which Is An Occupational Order .............................................................................18

D.  TSSI Is Covered By Wage Order 5, Not Wage Order 4 ...............................19

VII.  CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
  646 F.2d 413 (9th Cir. 1981) ...................................................................7, 8, 9

*Osman v. Tatitlek Support Services, Inc.*,
  2017 WL 945024 (C.D. Cal. March 1, 2017) ..........................................1, 2, 7

*Plaisted v. Dress Barn, Inc.*,
  2013 WL 300913 (C.D. Cal. Jan. 25, 2013) ....................................................8

*Wamboldt v. Safety-Kleen Sys., Inc.*,
  2007 WL 2409200 (N.D. Cal. Aug. 21, 2007) ..............................................18

*White v. Starbucks Corp.*,
  497 F. Supp. 2d 1080 (N.D. Cal. 2007) ...........................................................9

**State Cases**

*Brewer v. Patel*,
  20 Cal. App. 4th 1017 (1993) .........................................................................16

*Brinker Restaurant Corp. v. Super. Ct.*,
  53 Cal. 4th 1004 (2012) ...................................................................................6

*Harris Feeding Co. v. Dep't of Indus. Relations*,
  224 Cal. App. 3d 464 (1990) .........................................................................18

*Isner v. Falkenberg/Gilliam & Assocs., Inc.*,
  160 Cal. App. 4th 1393 (2008) ......................................................................17

*Jong v. Kaiser Foundation Health Plan, Inc.*,
  226 Cal. App. 4th 391 (2015) .......................................................................8, 9

*Mendiola v. CPS Security Solutions, Inc.*,
  60 Cal. 4th 833 (2015) ..............................................................10, 11, 16, 17

*Monzon v. Schaefer Ambulance Serv., Inc.*,
  224 Cal. App. 3d 16 (1990) ...........................................................................18

*Morillion v. Royal Packing Company*,
  22 cal. 4th 575 (2000) ........................................................................... 6, 18

**State Regulations**

Cal. Code Regs. 11040 ................................................................................ 19

Cal. Code Regs. 11040(2)(K) ..................................................................... 17

Cal. Code Regs. 11050 ................................................................................ 18

Cal. Code Regs. 11050(2)(K) ..................................................................... 16

Cal. Code Regs. 11050(2)(P) ........................................................... 11, 13, 19

Cal. Code Regs. 11050(2)(P)(1) ................................................................. 11

**IWC Wage Orders**

California Industrial Welfare Commission Wage Order 5 ......................... 10-13, 17-19, 20

California Industrial Welfare Commission Wage Order 4 ........................... 17-19

**Other Authorities**

DLSE ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL, § 46.5.1 ..................... 17

http://www.dir.ca.gov/dlse/manual-instructions.htm ....................................... 17

https://www.dir.ca.gov/dlse/opinions/1997-07-22-1.pdf ................................ 12

https://www.dir.ca.gov/whichIWCorderclassifications.pdf ........................... 11, 12, 18, 20

https://www.dir.ca.gov/whichIWCorderclassifications.pdf ............................ 12

http://www.29palms.marines.mil/News/News-Article-
  Display/Article/498974/marine-me/ at image 110314-M-ZU667-
  118.JPG) ........................................................................................... 14

http://www.29palms.marines.mil/News/News-Article-
  Display/Article/498384/38-marines/ at image 080923-M-1145B-002.jpg ................ 12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

42853419v.1

## I.   INTRODUCTION

After years of litigation, and the dismissals of over 100 related lawsuits, Plaintiff Jan Niazi ("Plaintiff") continues to pursue his claims for unpaid wages against Defendant Tatitlek Support Services, Inc. ("TSSI").  This motion will finally dispose of his claims.[1]

## II.   PROCEDURAL HISTORY

The Court is already familiar with the facts of these cases.  Plaintiff is a former employee who worked as a "role player" in simulated pre-deployment combat training for the U.S. Marine Corps at the federal military base in 29 Palms, California.  *See Osman v. Tatitlek Support Services, Inc.*, 2017 WL 945024 at *1 (C.D. Cal. March 1, 2017).

### A.   The Court Has Already Dismissed The Claims For Unpaid Wages Based On time Spent At The "Forward Operating Base" Where No Work Was Performed

In a prior motion in another case involving the role players working for TSSI, the Court found that "the role players were required to stay at 29 Palms for 24-hours a day, including off-duty hours."  *Osman*, 2017 WL 945024 at *2.

While on the U.S. military base at 29 Palms, Plaintiff and the other role players spent part of their time at the Forward Operating Base ("FOB").  While at the FOB, Plaintiff and the role players were able to engage in "purely personal pursuits" without the need to be on-call or working.  *Id.* at *2.

---

[1] Plaintiff has filed a "Motion To Abstain From Jurisdiction," set for hearing on January 22, 2018.  (Dkt. 25.)  Plaintiff's Motion To Abstain From Jurisdiction argues that this Court no longer has diversity jurisdiction because the amount in controversy does not exceed $75,000.

However, Plaintiff's pending lawsuit is subject to diversity jurisdiction because it arises from the appeal of a prior administrative award of unpaid wages and related penalties in the amount of $236,473.25.  (Dkt. 1-1 at p. 3 of 8.)  This Court has continued jurisdiction and may decide this Motion For Summary Judgment set for hearing on January 8, 2018, without the need to subsequently address Plaintiff's Motion To Abstain From Jurisdiction set for hearing on January 22, 2018.

1

After substantial briefing, the Court granted summary judgment for TSSI on the grounds that the role players were not entitled to wages for time spent at the FOB, merely because they were required to remain on the U.S. military base. *Osman*, 2017 WL 945024 at *4. As the Court held, "Plaintiff need not be compensated for the time he was not working simply because he remained on the base." *Id.* at *4. Thus, the time spent at the FOB has been held to be non-compensable and is no longer at issue.

**B.      Plaintiff's Only Remaining Claims Relate To Alleged Work Performed "Off The Clock" Or "On-Call" While In The Simulated Villages**

When Plaintiff and the other role players were not engaged in purely personal pursuits at the FOB, they were assigned to "missions" in simulated villages that resembled Afghanistan or Iraq. *Osman*, 2017 WL 945024 at *4. As the Court noted, on some missions, "the role players remained in the villages, where simulated combat training exercises took place and where the role players were under much more restrictive conditions than they were at the FOB." *Id.* The Court has not yet ruled on whether wages are due for all of the time spent in the simulated villages. In the prior motion in the *Osman* case, the Court held that it "will not consider any of the Plaintiff's arguments regarding the role players' time spent on missions and at the villages because they are outside the scope of this motion." *Id.*

However, Plaintiff contends that the Order in *Osman* leaves two issues to be resolved: (1) whether the role players were paid for all time "**working**" while in the simulated villages; and (2) whether the role players were paid for all time "**on-call**" while in the simulated villages. This motion shows that there are no triable questions of fact regarding these two remaining issues, so that judgment may be granted for TSSI, as a matter of law (in the alternative, TSSI seeks partial summary judgment as to both issues).

**III.   PLAINTIFF WAS PAID FOR ALL TIME ACTUALLY "WORKED" WHILE AT THE SIMULATED VILLAGES**

Plaintiff claims that he was required to work "off-the-clock" and denied wages for this time spent working. However, it is undisputed that Plaintiff was required to be "on-

2

1  the-clock" for all time worked and required to record and verify all time worked on his

2  time records.  Under these circumstances, Plaintiff cannot now claim that he worked

3  extra time that he failed to include in his daily time records.

**A.**   **Plaintiff Signed Written Employment Agreements Stating That He Would Accurately Record All Hours Worked**

Upon hire, Plaintiff signed a written "Role Player Employment Registration

Agreement." (Beja Decl., ¶¶ 11-12, Exh. D.)  The written agreements signed by Plaintiff

expressly stated that he was required to accurately record all time worked:

> You will be given a timecard or other means to record the hours you work each day.  It is your responsibility to accurately record the hours you work each day, and to ensure that you sign your timecard and submit it to your supervisor at the end of each workweek.

(Beja Decl., ¶ 12, Exh. D, p. 2.)  The written agreements signed by the Plaintiff also

stated that any inaccurate reporting of hours worked will be grounds for termination:

> You can be removed from the training in the middle of an exercise or not called for future missions for the following reasons:
>
> If you knowingly report inaccurate hours worked.

(Beja Decl., ¶ 12, Exh. D, p. 3.)

In addition to the Role Player Employment Registration Agreements, Plaintiff and

the other role players signed Role Player Employment Task Orders at the beginning of

each mission.  (Beja Decl., ¶ 13, Exh. E.)  The written Task Orders signed by the role

players explicitly stated that their time records should reflect his actual hours worked,

given that mission schedules were subject to change:

> I understand that my hours will reflect actual hours worked since mission schedules are subject to change.

(Beja Decl., ¶ 13, Exh. E, p. 1.)  The written Task Orders signed by the role players

before each mission also stated that not all time on the military base would be spent

working and that he would have a minimum of 5 hours and a maximum of 8 hours of

uninterrupted time for sleep each day:

> I understand that, each day, I will be allowed to:

3

- Have a minimum of five (5) and a maximum of (8) hours uninterrupted time for sleep.

(Beja Decl., ¶ 13, Exh. E, p. 1.)  Indeed, the written Task Orders signed by the role players stated that they should immediately inform their supervisor if their training schedule prevented them from receiving the allotted time for breaks and rest:

> If the training schedule prevents me from receiving breaks and rest periods, I will immediately advise my supervisor so that I may be provided alternative breaks and rest periods.

(Beja Decl., ¶ 13, Exh. E, p. 1.)  This part of the signed Task Orders also had to be separately initialed by the role players.

The written Task Orders signed by the role players before each mission also stated that role players could be terminated for failure to report their accurate hours worked:

> I understand that I can be removed from this mission or not invited to future missions if:
>
> - I knowingly report inaccurate hours worked.

(Beja Decl., ¶ 13, Exh. E, *see, e.g.,* p. 1.)

### B.   Plaintiff Signed Written Weekly Time Records Stating That He Must Correct Any Time Entries To Make Sure He Accurately Recorded All Hours Worked

Each week, Plaintiff was given Role Player Timesheets to record his daily hours worked.  Plaintiff was required to sign the Role Player Timesheets.  The Role Player Timesheets were written in English, as well Dari and Pashto, which were the native languages of many of the role players.  (Beja Decl., ¶¶ 14-16, Exh. F.)

The written Role Player Timesheets listed the anticipated "contract daily hours" worked, for which each of the role players were automatically paid.  However, the written Role Player Timesheets also stated that role players would be paid for the "contract daily hours" even if they worked fewer hours that day:

> We have completed the contract daily hours for which you will be paid, even though in most cases you worked fewer actual hours.

4

(Beja Decl., ¶ 15, Exh. F, *see, e.g.,* p. 2.)  The written Role Player Timesheets also explicitly acknowledged that role players may occasionally work more than the contract daily hours and should correct their timesheets to include all hours worked:

> Please carefully review the contract daily hours.  If you believe you worked MORE hours than are shown on the timesheet, cross out the incorrect hours and write in what you think are the correct hours.
>
> If you make corrections, you must take your timesheet to your supervisor for signature before you turn it in.
>
> You may also request a blank timesheet and complete it yourself.

(Beja Decl., ¶ 16, Exh. F, *see, e.g.,* p. 2.)

### C.   **Plaintiff Routinely Corrected His Written Weekly Timesheets To Reflect Additional Hours Worked And Was Routinely Paid For The Extra Hours He Added**

In compliance with TSSI's written policies, Plaintiff routinely added extra hours to his contract daily hours.  Plaintiff signed each of his timesheets, stating that "I certify that the hours worked are true and correct to the best of my knowledge and belief." (Beja Decl., ¶ 18, Exh. F, *see, e.g.,* p. 1.)

Plaintiff's timesheets show 119 days with extra hours of work, for a total of 900 hours added.  All of the extra time added by Plaintiff was paid in full.  (Beja Decl., ¶ 19, *and see* Exh. F (manually corrected Timesheets) in its entirety.)

Further, all of the extra time added by Plaintiff was "rounded" upward to the next thirty minute half hour or sixty minute full hour.  Based on TSSI's rounding practices, even 10 minutes of extra work would be rounded upward to 30 minutes, or 31 minutes of extra work would be rounded upward to 60 minutes. (Beja Decl., ¶ 20.)  Accordingly, Plaintiff was paid for large amounts of time not worked.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

42853419v.1

## IV. PLAINTIFF IS NOT ENTITLED TO ANY ADDITIONAL WAGES FOR ALLEGED HOURS WORKED OFF-THE-CLOCK WHILE AT THE SIMULATED VILLAGES BECAUSE HE FAILED TO REPORT IT ON HIS SIGNED WRITTEN TIMESHEETS

### A. Timesheets Signed And Certified By Employees Are Presumed To Be An Accurate Reflection Of Actual Hours Worked

In the decision in *Brinker Restaurant Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1051 (2012), the California Supreme Court held that time records are presumed to be accurate and failing to record time worked creates a presumption of an employee not working—"that employees are clocked out creates a presumption they are doing no work."

Where an employer requires employees to accurately record all of their time worked, there can be no liability for unpaid wages unless an employer knows or should have known employees are working off the clock. As stated by the California Supreme Court in *Morillion v. Royal Packing Company*, 22 cal. 4th 575, 585 (2000), an employee is not deemed to be "suffered or permitted to work" unless the employer knows or should have known that work was being performed:

> [T]he "suffer" and "permit" [to work] [standard] as used in the statute means "with knowledge of the employer." Thus, **an employer who knows or should have known that an employee is or was working overtime must comply with the [overtime] provisions.**

*Id.* (citations omitted; emphasis added). The California Labor Commissioner, Division of Labor Standards Enforcement ("DLSE"), counsel of record for Plaintiff in this case, has applied the *Morillion* decision to cases where an employee signs a timesheet and then later claims the timesheet is not accurate. As stated by the DLSE, an employee cannot recover alleged "unpaid wages" if the employee deliberately prevents the employer from knowing that extra time was worked:

> [I]f [an] employee deliberately prevents the employer from obtaining knowledge of overtime worked, the employee cannot later claim recovery. The employer must have the opportunity to obey the law.

DLSE Enforcement Policies And Interpretations Manual, § 47.6.3 (2002).

Due to the unique working conditions for the role players, the timesheets that were signed and certified by Plaintiff and the other role players were the **only method** for TSSI to know the accurate amount of time worked. This is because the U.S. Marine

6

Corps, rather than TSSI, determined the amount of time worked by the role players, based on the needs of each pre-combat training exercise. As the Court already held, "the training exercises were directed by the USMC who would create a Master Scenario Event List ('MSEL') that assigned duties to each role player." *Osman*, 2017 WL945024 at *1. Also, given the ever-changing training mission schedules of the Marines, as well as the thousands of acres containing the simulated villages at the U.S. military base at 29 Palms, TSSI could not possibly know where and when the role players were working or not working, unless the time worked was included on the time records. (Beja Decl., ¶ 17.)

**B.** **Courts Have Routinely Granted Summary Judgment Against Claims For Unpaid Work Off The Clock, Where Employees Have Previously Signed And Certified Their Timesheets As To All Hours Worked**

In *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981), the Ninth Circuit held that an employee cannot recover wages for work off-the-clock where the employee fails to accurately record all time worked on the employer's designated time records. In *Forrester*, plaintiff had omitted time he allegedly worked when filling out his time records, and then sought payment from his employer. *Id.* at 413. In seeking his alleged unpaid overtime wages, the plaintiff offered evidence showing that he kept his own detailed log of all of the time he worked without pay, but did not record it on his official time records. *Id.*

The Ninth Circuit held that there was no viable claim that the plaintiff was owed unpaid wages because the plaintiff either failed to notify the employer about his alleged unpaid wages or deliberately prevented the employer from learning about any alleged off-the-clock work. *Id.* at 414. In affirming summary judgment for the employer, the Ninth Circuit held that the plaintiff was not entitled to additional wages, because he failed to include the alleged extra time worked on his time records, although he knew that he should have been paid:

> [I]t is quite obvious that . . . [plaintiff] deliberately omitted the inclusion of those hours from his time sheet even though he admittedly knew that he should have been paid for those hours.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

42853419v.1

*Id.*  Following the decision in *Forrester*, numerous district courts in the Ninth Circuit have similarly held that an employer is not liable for alleged off-the-clock work where an employee fails to submit accurate time records.

The recent decision in *Plaisted v. Dress Barn, Inc.*, 2013 WL 300913 (C.D. Cal. Jan. 25, 2013), is directly on point.  In *Plaisted*, employees were "required to sign the[ir] time card if they agree with their time cards or describe why they disagreed with them." *Id.* at *3.  The plaintiff signed "at least 67" time cards indicating that "her recorded hours were correct."  *Id.*  Given that the plaintiff signed her time cards, and had an opportunity to make corrections to additional hours, the court granted summary judgment in favor of the employer:

> With respect to [plaintiff's] off-the-clock overtime claim, the court finds that there is likewise no genuine issue of material fact as to [the employer's] lack of actual or constructive knowledge of any of her supposed off-the-clock work.  [The employer] did not know [plaintiff] was working off-the-clock because she signed off on her Final Payroll Records for at least 67 weeks indicating that her recorded hours were correct . . . .
>
> Thus, there is not a scintilla of evidence to show that [the employer] knew or should have known that [plaintiff] was working off-the-clock.  Therefore, the court finds that [the employer] is entitled to summary judgment as a matter of law as to the overtime claim.

*Id.* at *4-5 (citing *Forrester*, 646 F.2d at 414).

In *Jong v. Kaiser Foundation Health Plan, Inc.*, 226 Cal. App. 4th 391, 395 (2015), the California Court of Appeal similarly affirmed summary judgment for the employer on the grounds that an employee cannot claim overtime where he deliberately fails to record all time worked on his time records.  In granting summary judgment, the court stated:

> Where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation . . . .
>
> An employer must have an opportunity to comply with the [law].  [W]here the acts of an employee prevent an employer from acquiring knowledge, here of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work . . . .

1  *Id.* (citing *Forrester*, 646 F.2d at 414.

2  **C.**  **Courts Have Routinely Granted Summary Judgment Against Claims For Unpaid Work Off The Clock, Even Though Employees Claim That The Employer Had Knowledge Of Off-The-Clock Work**

3

4  In *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1083-1085 (N.D. Cal. 2007),

5  the court granted summary judgment for the employer on a claim for unpaid wages

6  worked off-the-clock, despite the plaintiff's claim that the employer was aware of

7  additional work being performed.  In *White*, the plaintiff claimed that he should have

8  been paid for extra work because the employer "knew about some unspecified time

9  worked off-the-clock [because] [it] knew how much time it took to perform much of the

10  work required . . . ."  *Id.*  The plaintiff argued that "this level of intimate knowledge of

11  the [employee's activities] in and of itself would support a reasonable conclusion that the

12  [employer] should have known what its [employees] were doing."  *Id.* at 1084.  In other

13  words, the plaintiff claimed that the employer had constructive knowledge of time

14  worked off-the-clock based on its familiarity with the work being performed.

15  In granting summary judgment for the employer, the court held that knowledge

16  that work might take longer is not the same as actual or constructive knowledge that work

17  was performed off-the-clock:

18  > The court is troubled by plaintiff's evidence.

19  > [Plaintiff] has failed to raise genuine issues of fact.  Based on [plaintiff's] "evidence," the court finds that no reasonable jury could conclude that [the employer] knew about [plaintiff's] alleged unpaid time.  [Plaintiff's] theories for imputing knowledge to [the employer] are pure conjecture.

20

21

22  *Id.* at 1085.  The court also noted that there was no triable issue of additional overtime

23  hours worked off-the-clock, given that the plaintiff had been paid for a significant amount

24  of overtime when he recorded extra hours on his time records:

25  > Imputing constructive knowledge would be particularly inappropriate given that [plaintiff] was paid for significant overtime during his brief tenure and admitted he was never criticized for working overtime.  Accordingly, [the employer's] motion for summary judgment on [the] claim for unlawful failure to pay overtime wages ("off the clock claim") is GRANTED.

26

27  *Id.*

28

9

42853419v.1

Here, it is undisputed that Plaintiff worked a significant amount of overtime and had his time records adjusted to reflect **hundreds** of hours of extra overtime worked, including double time hours.  In fact, Plaintiff adjusted his time records to reflect extra hours worked on 119 days, showing **900 additional hours** worked.  (Beja Decl., ¶ 19, Ex. F.)  Thus, there can be no triable issue that TSSI was aware that Plaintiff worked any additional overtime hours off-the-clock, given that Plaintiff added hundreds of additional hours to his time records and TSSI paid for all of the hours he added.

## V.    PLAINTIFF IS NOT ENTITLED TO ANY ADDITIONAL WAGES FOR ALLEGED TIME SPENT ON-CALL WHILE AT THE SIMULATED VILLAGES BECAUSE THE APPLICABLE WAGE ORDER 5 LIMITS COMPENSABLE TIME TO ONLY TIME SPENT ACTUALLY WORKING

As shown above, Plaintiff was paid for all of the time spent actually working, as recorded and verified by his own signed time records.  However, Plaintiff argues that all of the time spent at the simulated villages constitutes compensable "hours worked," because the role players were required to sleep at the villages so that they would be on-call to participate in impromptu military training exercises in the middle of the night.

To the extent that Plaintiff was on-call when sleeping or residing at the simulated villages, but not actually working, he is **not** entitled to wages.  This is because TSSI is subject to California Industrial Welfare Commission Wage Order 5, which requires compensation only for time spent actually working, but does not require compensation for time spent on-call.

### A.    The California Industrial Welfare Commission Has Issued Separate Wage Orders To Apply To Different Industries That Require Different Kinds Of Regulation

Under California law, "wage and hour claims are . . . governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the [Industrial Welfare Commission] [or] IWC."  *Mendiola v. CPS Security Solutions, Inc.*, 60 Cal. 4th 833, 838 (2015) (citations omitted).  The wage orders issued by the IWC "are legislative regulations specifying minimum requirements with respect to wages, hours,

10

and working conditions." *Id.*  There are 18 separate wage orders and "their internal variations reflect the reality of differing aspects of work in different industries [and] may call for different kinds of regulation." *Id.*

**B.**   **Wage Order 5 Applies To Any Employer Providing Meals, Housing, Or Maintenance Services, Either As Its Primary Business Or Incidental To Other Operations**

Wage Order 5 applies to the "public housekeeping industry."  Wage Order 5 defines the public housekeeping industry as "any industry, business, or establishment which provides meals, housing, or maintenance services **whether operated as a primary business or when incidental to other operations in an establishment** not covered by an industry order of the [IWC]."  Wage Order 5-2002(2)(P), codified at 8 Cal. Code Regs. 11050(2)(P).  To be covered by Wage Order 5, a business does not need to be exclusively, or even primarily, engaged in providing meals, housing, or maintenance services.  These services may be merely "incidental to the other operations in an establishment." *Id.*

The businesses explicitly covered by Wage Order 5 include:

- "cafeterias, boarding houses, clubs, and all similar establishments where food in either solid or liquid form is prepared and served to be consumed on the premises" Wage Order 5-2002(2)(P)(1); 8 Cal. Code Regs. 11050(2)(P)(1).
- "catering, banquet, boxed lunch service, and similar establishments which prepare food for consumption on or off the premises" Wage Order 5-2002(2)(P)(2); 8 Cal. Regs. 11050(2)(P)(2).
- "rooming houses, camps, clubs, trailer parks, . . . and similar establishments offering rental of living, business, or commercial quarters" Wage Order 5-2002(2)(P)(3); 8 Cal. Regs. 11050(2)(P)(3).
- "establishments contracting for development, maintenance, or cleaning of grounds; maintenance or cleaning facilities and/or quarters of commercial units and living units" Wage Order 5-2002(2)(P)(6); 8 Cal. Regs. 11050(2)(P)(6).

The DLSE, counsel of record for Plaintiff, maintains a website to assist businesses in determining which wage order covers their establishment, located at https://www.dir.ca.gov/whichIWCorderclassifications.pdf.  According to the DLSE,

11

Wage Order 5 specifically covers establishments that provide "rooming houses," "camps," "trailer parks," and "similar establishments offering rental of living, business, or commercial quarters." *Id.* at p. 18. The DLSE also lists additional examples of businesses covered by Wage Order 5, including "banquet service" providers; "catering service" providers; "cafeterias;" "day camps;" businesses that provide "cleaning of facilities, grounds, commercial units, living units;" "cook houses in lumber camps;" businesses that provide "development of grounds;" "dude ranch;" "eating places;" "farm labor camps with board or lodging;" "fraternity houses;" "janitorial service;" "logging camps with board or lodging;" "lunch counters;" "lunch wagons;" businesses that provide "maintenance of grounds, facilities, quarters of commercial units and living units;" "organized camps;" "property management;" "restaurants;" "schools . . . with board or lodging;" and "trailer parks." *Id.* at pp. 19-20.[2]

As interpreted by the DLSE, "the key to the definition [of a business covered by Wage Order 5] is the word 'provide' by which the Commission intended to mean provided to the public or other businesses." DLSE Opinion Letter entitled "Occupation Wage Orders v. Order 5 at p. 1, located at https://www.dir.ca.gov/dlse/opinions/1997-07-22-1.pdf. As interpreted by the DLSE, Wage Order 5 was not meant to cover businesses that merely provide meals, housing, or maintenance for their **own employees**. Rather, Wage Order 5 was meant to cover businesses that provide meals, housing, or maintenance to **other business or third-parties**:

> Obviously, a law firm which, incidentally, hired a janitor would not be transformed into a Public Housekeeping Industry firm. Were that the case, all insurance companies, banks, public utilities and professional firms which hired a janitor would be transformed into Order 5 employers.
>
> If, on the other hand, a legal firm also hired janitors and groundskeepers as part of a janitorial or maintenance service which they

---

[2] The DLSE also interprets Wage Order 5 to include **all employees** of a business covered by the Wage Order, rather than merely those employees engaged in the specific job duties that fall under the Wage Order. *See* https://www.dir.ca.gov/whichIWCorderclassifications.pdf at p. 20.

42853419v.1

offered to other firms, that law firm would be under Order 5 even though the maintenance service would only be incidental to other operations in the establishment.

*Id.*  TSSI undeniably fits within Wage Order 5 because it undeniably provided meals, housing, and maintenance to a third-party, the Marines.   Although Plaintiff may argue that TSSI's "primary business" was to provide personnel to the Marines to act as role players, Plaintiff cannot dispute that TSSI also provided meals, housing, and maintenance to the Marines while the Marines were at the simulated villages.

TSSI provided meals, housing, and maintenance to their third-party client, the Marines, as much more than something that was "incidental to other operations," which is all that is necessary to be covered by Wage Order 5.  *See* Wage Order 5-2002(2)(P), codified at 8 Cal. Code Regs. 11050(2)(P).  It is undisputed that a substantial and necessary portion of TSSI's business was to provide meals, housing, and maintenance to the Marines—TSSI spent $2,515,552.64 on meals to be provided at 29 Palms and $212,513.81 on paper and plastic utensils for meals.  (Beja Decl., ¶ 7.)  TSSI also spent $1,632,400.91 on equipment and furnishing for the housing in the simulated villages.  (Beja Decl., ¶ 7.)  For maintenance costs at the simulated villages, TSSI spent $1,467,942.54 for supplies and materials.  (Beja Decl., ¶ 7.)

### C. TSSI Is In The Business Of Providing Meals, Housing, And Maintenance Services, Either As Its Primary Business Or Incidental To Other Operations

#### 1. TSSI Provided Meals To Marines At Simulated Villages

It is undisputed that TSSI was in the business of providing "meals" to the Marines at the simulated villages.  (Lewis Decl., ¶¶ 3-5; Beja Decl., ¶¶ 4, 6, Exh. D.)  Indeed, the primary purpose of the pre-deployment training activities was to provide an authentic "day-in-the-life" experience for the Marines, so that they would be prepared for living conditions in Afghanistan and Iraq.  (Beja Decl., ¶ 4.)  This necessarily included providing meals that were authentic to the cuisine to be experienced by the Marines after deployment overseas.  (Beja Decl., ¶ 4.)  These meals were prepared by TSSI's

13

employees and served by TSSI's employees to Marines and role players at the simulated villages.  (Beja Decl., ¶ 8.)

The Marines developed thousands of specific training scenarios referred to as "MSELs," which included detailed instructions for providing meals for the Marines at the simulated villages.  For example, MSELs required TSSI to provide meals in which various types of role players dined with "EXFOR" Marines:

> 1100-1200  **LUNCHEON DEPENDENT ON MoV [MISSION]**
>
> DISTRICT GOVERNOR HOSTS LUNCHEON WITH EXFOR [EXERCISE FORCE MARINES], LOCAL MALIK, ELDERS, MULLAH, AND GOVT OFFICIALS

(Beja Decl, ¶ 6, Exh. A.)  Attached is a photograph showing the Marines eating meals provided by TSSI during a training mission at the simulated villages on the 29 Palms U.S. military base.  (Beja Decl., ¶ 10, Exh. B -- (http://www.29palms.marines.mil/News/News-Article-Display/Article/498974/marine-me/ at image 110314-M-ZU667-118.JPG).)

To meet its obligations to provide meals at the simulated villages, TSSI spent $2,515,552.64.  (Beja Decl., ¶ 7.)

## 2.    TSSI Provided Housing To Marines At Simulated Villages

It is undisputed that TSSI was in the business of providing "housing" to the Marines at the simulated villages.  (Lewis Decl., ¶¶ 4-5; Beja Decl., ¶¶ 4, 6.)  The simulated villages included "lodging" and "camps."  (Lewis Decl., ¶ 4.)  TSSI "constructed, operated, and supplied the atmospheric features for these villages, which were a collection of over 2,000 different structures, including huts, multi-story cinder-block based buildings, metal prefabricated buildings, warmings houses, camps, traditional cafes, and traditional markets made to resemble similar structures in Iraq and Afghanistan."  (Lewis Decl., ¶ 4.)  Attached is a photograph showing one of the simulated villages operated by TSSI for the pre-deployment training and housing of the Marines at the 29 Palms U.S. military base.  (Beja Decl., ¶ 10, Exh. C --

14

(http://www.29palms.marines.mil/News/News-Article-Display/Article/498384/38-marines/ at image 080923-M-1145B-002.jpg).)

It was necessary to provide housing at the simulated villages because TSSI "operated these villages 24 hours per day, 7 days a week, for the benefit of [the] client, the Marines." (Lewis Decl., ¶ 4.) "Role players and Marines stayed in these facilities during the training missions, sometimes sleeping in the villages overnight, and they would eat TSSI-prepared meals in the village structures." (Lewis Decl., ¶ 5.) "These facilities provided food and lodging for the Marines and the role players who were involved in training activities." (Lewis Decl., ¶ 5.)

In order for the housing at the villages to be authentic, TSSI was required to provide everything necessary to operate all of the activities that would be included in a village in Afghanistan or Iraq. (Beja Decl., ¶ 4.) In operating the villages, TSSI provided all of the furnishings, including beds, couches, rugs, lamps, tables, decorations, restrooms, recreational facilities, and simulated businesses. (Beja Decl., ¶ 8.)

TSSI spent $1,632,400.91 on equipment and furnishings for the simulated villages. (Beja Decl., ¶ 8.)

### 3.    TSSI Provided Maintenance For Simulated Villages

It is undisputed that TSSI was in the business of providing "maintenance" to the Marines at the simulated villages. (Lewis Decl., ¶ 5; Beja Decl., ¶¶ 5-6.) "The Marines tasked TSSI with maintaining and cleaning the village grounds, facilities, sleeping quarters, and other structures." (Lewis Decl., ¶ 6.) The maintenance provided by TSSI was for the benefit of the Marines and "the villages and other facilities had to be operated based on the specifications dictated by TSSI's client, the Marines." (Lewis Decl., ¶ 6.)

Essentially, TSSI was required to provide constant cleaning services. (Beja Decl., ¶ .) After each training "mission," TSSI was required to clean the facilities at the villages. (Beja Decl., ¶ 5.) TSSI had to clean the facilities that had been used and prepare the facilities for the next training mission. (Beja Decl., ¶ 5.) TSSI's employees

were responsible for maintaining the villages so that each of the facilities would be usable for any type of training mission determined by the Marines.  (Beja Decl., ¶ 5, 6.)  This required TSSI's employees to perform maintenance services immediately after an exercise or at any time requested by the Marines, because the start and stop times for the training missions varied.  (Beja Decl., ¶ 5.)

The cost of providing maintenance at the simulated villages was approximately $1,467,942.67 for supplies and materials.  (Beja Decl., ¶ 7.)

### D. As Provided Under Wage Order 5, Employees Are Paid Only For Time Spent Actually Working, But Not For Time Spent On-Call

Wage Order 5 explicitly defines "hours worked" as "in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties."  Wage Order 5-2002(2)(K), codified at 8 Cal. Code Regs. 11050(2)(K).  In *Mendiola*, 60 Cal. 4th at 843, the California Supreme Court held that under Wage Order 5, the compensable "hours worked" are limited to only "**time spent carrying out assigned duties**."  *Id.* (emphasis in original).  Wage Order 5 has consistently been interpreted to require wages to be paid only for time spent actually working, but not for time spent on-call or when an employee simply needs to be available while residing on the employer's premises.

In *Brewer v. Patel*, 20 Cal. App. 4th 1017, 1020 (1993), the plaintiff, who was represented by the DLSE, argued that Wage Order 5 should be interpreted to require payment for "the entire time he spent" on-call at the employer's facility.  The defendant argued that Wage Order 5 requires "compensation only for the time actually worked."  *Id.*

The California Court of Appeal held that Wage Order 5 "mandates a special rule" for certain employees "who are obligated to reside on the work premises.  Employees covered by Wage Order 5 must be compensated only for "the time spent carrying out assigned duties."  *Id.* at 1021.  As the court explained:

This language [in Wage Order 5] is obviously meant to address the special circumstances of those who are required to reside where they work.  An employee such as this is not always working.

16

42853419v.1

The language [of Wage Order 5] accepts this reality and states that an employee in this situation must be compensated only for 'that time spent carrying out assigned duties,' in other words, only for the work the employee actually provides.

*Id.*  The decision in *Isner v. Falkenberg/Gilliam & Assocs., Inc.*, 160 Cal. App. 4th 1393, 1400 (2008), reaches the same result.  Pursuant to Wage Order 5:

[E]mployees who are required to reside where they work are entitled to be compensated for time spent performing their assigned duties; they are not entitled to be compensated for time spent simply being available to perform those duties.

*Id.*  The DLSE ENFORCEMENT POLICIES AND INTERPRETATIONS MANUAL, § 46.5.1 ("Wage Order 5 sleep-time exclusion"), at http://www.dir.ca.gov/dlse/manual-instructions.htm, similarly states that "for employees who are required to reside on the employment premises, hours worked includes 'that time spent carrying out assigned duties,' which would exclude time spent sleeping."

## VI.    PLAINTIFF IS NOT ENTITLED TO ANY ADDITIONAL WAGES FOR ALLEGED TIME SPENT ON-CALL WHILE AT THE SIMULATED VILLAGES BECAUSE WAGE ORDER 4 IS INAPPLICABLE

Plaintiff and the DLSE have taken the position that Wage Order 4-2001 applies to TSSI's operations, rather than Wage Order 5-2001.  (*See* Dkt. 1-1, p. 6 of 8.)  Wage Order 4 defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  Wage Order 4-2001(2)(K), codified at 8 Cal. Code Regs. 11040(2)(K).

In *Mendiola*, 60 Cal. 4th at 839, the court held that, because the definition of "hours worked" in Wage Order 4 includes any time an employee is "suffered or permitted to work, whether or not required to do so," it means that "an employee who is subject to an employer's control does not have to be working during that time to be compensated."

42853419v.1

Plaintiffs are likely to argue that Wage Order 4 requires payment for all time spent at the simulated villages, including time spent sleeping and time spent on-call. Unfortunately for Plaintiffs, Wage Order 4 does not cover Defendants' industry.

### A. There Are Two Types Of Wage Orders—"Industry Orders" And "Occupational Orders"

The IWC has published some wage orders that apply to an entire industry and some wage orders that apply only to specific occupations. The IWC has published "orders [that] cover specific industries and . . orders [that] cover occupations." *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 581 (2000), as modified (May 10, 2000); *accord Monzon v. Schaefer Ambulance Serv., Inc.*, 224 Cal. App. 3d 16, 29 (1990) (same).

"An industry order . . . regulates wages, hours and working conditions in specific industries. An order is an industry order if the title of the order contains the word 'industry.' Otherwise, the order is an occupational order." WHICH IWC ORDER?, at p. 4, located at https://www.dir.ca.gov/whichIWCorderclassifications.pdf.

### B. "Industry Orders" Preempt "Occupational Orders"

"If the business is **not** covered by an industrial order, then occupational orders must be turned to." *Wamboldt v. Safety-Kleen Sys., Inc.*, 2007 WL 2409200, at *6 (N.D. Cal. Aug. 21, 2007) (emphasis added). "Employees not working in an industry covered by an 'industry' order may be covered by an 'occupational' order." *Harris Feeding Co. v. Dep't of Indus. Relations*, 224 Cal. App. 3d 464, 470 (1990).

### C. Wage Order 5, Which Is An Industry Order, Preempts Wage Order 4, Which Is An Occupational Order

Wage Order 5 is an industry order because it expressly applies to the "public housekeeping **industry**." Wage Order 5-2001, codified at 8 Cal. Code Regs. 11050 (emphasis added). In contrast, Wage Order 4 is an occupational order because it applies only to "persons employed in professional, technical, clerical, mechanical and similar **occupations**." *Harris*, 224 Cal. App. 3d at 467 (emphasis added).

### D.   **TSSI Is Covered By Wage Order 5, Not Wage Order 4**

As shown above, TSSI provided meals, housing, and maintenance to their third-party client, the Marines.  Undeniably, TSSI is covered by Wage Order 5 because it applies to "any industry, business, or establishment which provides meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations."  Wage Order 5-2001(2)(P), codified at 8 Cal. Code Regs. 11050(2)(P).

Plaintiff and the DLSE are likely to argue that TSSI was in the business of providing role players, not in the business of providing meals, housing, or maintenance. But even if TSSI had a primary business of providing personnel to serve as role players for pre-deployment training activities conducted by the Marines, Plaintiff still cannot dispute that TSSI also provided the Marines with incidental services of meals, housing, and maintenance.  In fact, while TSSI did, in fact, provide a couple thousand employees to serve as role players, it cannot be disputed that TSSI was also providing meals, housing, and maintenance to many thousands of Marines on the 29 Palms U.S. military base.  (Beja Decl., ¶ 9.)

Plaintiff and the DLSE are also likely to argue that TSSI somehow more closely fits within Wage Order 4, which applies to "professional, technical, clerical, mechanical, and similar occupations" (as they did and is reflected in Niazi's DLSE award).  Wage Order 4-2001, codified at 8 Cal. Code Regs. 11040; *see also* Dkt. No. 1-1 (DLSE Award), p. 6 of 8.  Wage Order 4 defines its coverage to include job categories such as "professional, semi professional, managerial, supervisorial, laboratory, research, technical, clerical, office work, and mechanical occupations."  *Id.* at (2)(O).  Yet, it is inconceivable that role players hired to act as villagers or insurgents to simulate conditions in Afghanistan or Iraq were engaged in any of these listed occupations.

At best, Plaintiffs might argue that the role players fit within the job classification of "demonstrators and display representatives" or "models," as listed in Wage Order 4. *Id.*  However, the DLSE has explicitly identified and clarified "demonstrators and display

42853419v.1

representatives," as well as "models," as occupations that are **not covered by Wage Order 4 if their employer is covered by an industry order** (like Wage Order 5):

> Use of the asterisk (*) in the following list indicates Order 4, an occupational order, covers the named and related occupations only when they are not covered by an industry order.  The type of business determines the industry order.
>
> *demonstrators
> *models

WHICH IWC ORDER?, at p. 16-17, located at --

https://www.dir.ca.gov/whichIWCorderclassifications.pdf.  Thus, there can be no dispute that Wage Order 5 applies and Wage Order 5 does not require compensation for time spent on-call.

## VII.   CONCLUSION

For the reasons previously stated by the Court in *Osman*, 2017 WL 945024, at *4, Plaintiff is not entitled to be compensated for time spent at the FOB, where no work was performed.  In addition, for the reasons stated in this motion, Plaintiff is not entitled to any additional compensation for time spent at the simulated villages.  To the extent that Plaintiff was working while at the simulated villages, he was paid for all of the time he worked, as reflected on his signed time records, which included hundreds extra hours of overtime work.  To the extent that Plaintiff was on-call while sleeping or not performing assigned duties while at the simulated villages, he is not entitled to additional compensation because Wage Order 5 requires wages only for time spent actually working, not time spent on-call.

DATED: December 4, 2017                    SEYFARTH SHAW LLP


                                        By: */s/ John R. Giovannone*
                                            Jon D. Meer
                                            John Giovannone
                                            Paul L. Leaf

                                            Attorneys for Defendant, Appellant, and Cross-Claimant TATITLEK SUPPORT SERVICES, INC.

42853419v.1