1
2
3
4

Division of Labor Standards Enforcement
Department of Industrial Relations
State of California
Jessica Fry (State Bar No. 264480)
7575 Metropolitan Drive, Suite 210
San Diego, CA 92108-4424
Tel:  (619) 767-2023
Fax: (619) 767-2026

5
6

Attorney for Labor Commissioner on behalf
of Plaintiff/Respondent & Cross-Defendant

7

UNITED STATES DISTRICT COURT

8

CENTRAL DISTRICT OF CALIFORNIA

9
10

JAN NIAZI,

     Plaintiff/Respondent and
Cross-Defendant,

11

     v.

12
13

TATITLEK SUPPORT SER-
VICES, INC., an Alaskan corpora-
tion,

14
15

     Defendant/Appellant and
Cross-Claimant.

Case No. 2:15-cv-07403-SVW-JPR

Hon. Stephen V. Wilson

**Opposition to Motion for Summary Judgment**

Hearing date: January 29, 2018
Time: 1:30 p.m.
Courtroom: 10A

16
17
18
19
20
21
22
23
24
25
26
27
28

## **Table of Contents**

Table of Authorities ........................................................................................... ii

Introduction ....................................................................................................... 1

Summary of Facts ............................................................................................. 2

   I.   Mr. Niazi's Experience at Twentynine Palms .......................................... 2

   II.   The Theater of War Created by Defendant ........................................... 5

   III.  The Tatitlek Corporation ...................................................................... 6

   IV.    Procedural History ............................................................................. 7

Summary Judgment Standard ........................................................................... 8

Argument ........................................................................................................... 8

   I.   There is a dispute of material fact as to hours worked by Plaintiff. ................... 8

   II.   There is a dispute of material fact as to whether Plaintiff was instructed to record nightly disturbances. ........................................................................ 9

   III.  There is a dispute of material fact as to the number and character of hours worked by Mr. Niazi. ............................................................................ 10

   IV.    There is a dispute of material fact as to which Wage Order applies. ............. 11

      A.   The Industrial Wage Orders are to be liberally construed. ............................ 12

      B.   The Role Players are role players, an occupation governed by IWC Wage Order 4. ..................................................................................... 12

      C.   It is unclear whether the Public Housekeeping Order applies. ....................... 15

   V.   Even if Wage Order 5 applies, there is a genuine dispute as to whether all hours spent at the village are compensable. ....................................... 17

Conclusion ........................................................................................................ 18

## <u>Table of Authorities</u>

**Cases**

*Ambat v. City & Cty. of San Francisco,*
  757 F.3d 1017 (9th Cir. 2014) ...................................................................11

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................. 8, 11

*Armour & Co. v. Wantock,*
  323 U.S. 126 (1944) ..................................................................................9

*Augustus v. ABM Sec. Servs., Inc.,*
  2 Cal. 5th 257 (2016) ........................................................................ 12, 14

*Brewer v. Patel,*
  20 Cal. App. 4th 1017 (1993) ...................................................................17

*Forrester v. Roth's I. G. A. Foodliner, Inc.,*
  646 F.2d 413 (9th Cir. 1981) .....................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ..................................................................................8

*Morillion v. Royal Packing Co.,*
  22 Cal. 4th 575 (2000) ..............................................................................8

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,*
  210 F.3d 1099 (9th Cir. 2000) .................................................................11

*Osman v. Tatitlek Support Servs., Inc.,*
  No. 215CV06044SVWJPR, 2017 WL 945024 (C.D. Cal. Mar. 1, 2017) ......7, 13, 14

*Rodriguez v. E.M.E., Inc.,*
  246 Cal. App. 4th 1027 (2016) ........................................................... 15, 16

*Singh v. Superior Court,*
  140 Cal. App. 4th 387 (2006) ...................................................................15

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ..................................................................................9

*Varsam v. Lab. Corp. of Am.,*
  120 F. Supp. 3d 1173 (S.D. Cal. 2015) ....................................................10

*Washington v. Crab Addison, Inc.,*
  No. C 08-5551 PJH, 2010 WL 2528963 (N.D. Cal. June 18, 2010) ......................10

**Statutes**

Cal. Lab. Code, § 226 ..................................................................................10

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................. 8, 11

**Regulations**

Cal. Code Regs. tit. 8, § 11040 ............................................................. 8, 13
Cal. Code Regs. tit. 8, § 11050, at Section 2(K) ............................8, 9, 15, 17

1

2
### Introduction

3         Plaintiff Jan Niazi was one of many role players hired by Tatitlek Support Ser-

4   vices, Inc., to act as an Afghani villager at a training complex, as part of the military's

5   real life simulation of life in a war zone. Essentially, Mr. Niazi was a role player in an

6   elaborate war game. Based out of the Forward Operating Base, at times he was re-

7   quired to go into "villages" to perform specific missions. For his efforts, he was paid

8   for his contract hours, plus any other "working" time, as defined by Defendants. How-

9   ever, he was not paid for all on-duty hours in the villages, which Defendant mischar-

10  acterizes as "on-call."[1] Furthermore, he was not paid for time during that his "sleep

11  time" was interrupted by his assigned duties.

12         Ignoring the heart of Plaintiff's claim, TSSI's motion for summary judgment

13  argues that Mr. Niazi is precluded from asserting a claim for unpaid wages where he

14  signed a time sheet attesting as to hours worked. But these are not hours that Defend-

15  ant would have paid but for Plaintiff's concealment of the hours. Rather, these are

16  hours that TSSI was well aware of, but it defined them as non-compensable. TSSI's

17  argument that Plaintiff is barred from seeking compensation for hours that TSSI

18  would never have paid is an argument from fallacy.

19         TSSI further argues that TSSI is governed by Wage Order 5, the industry order

20  for the "Public Housekeeping Industry." To claim that the war games put on for the

21  benefit of military training is covered by an order that applies to hotels, restaurants,

22  and schools requires a level of mental gymnastics that stretches the imagination. If

23  you read just the selected portions of the wage order in isolation, perhaps one can

24  make an argument that it applies – but one cannot take the order out of the context that

25  the legislature and the Industrial Welfare Commission intended: protection for work-

26  ers in the service industry. Furthermore, Tatitlek, Inc., has 11 subsidiaries, performing

27

28  ---
[1] Plaintiff's claims for uncompensated on-call time at the Forward Operating Base are unaddressed in Defendant's motion and thus outside the scope of this opposition.

Opposition to Motion for Summary Judgment

a diversity of work that includes collection and processing of remotely sensed information, commercial construction, general contractor services, management services, marine oil-spill response, technical, professional, and administrative services, armed and unarmed security services. These are obviously all far afield of the public housekeeping industry. TSSI fails to establish that it operates separately and distinctly from the other services offered by Tatitlek, Inc., an ambiguity that warrants the opportunity to develop the case rather than ending the inquiry at summary judgment.

Moreover, even if the Public Housekeeping Industry Order applies, the time claimed by Mr. Niazi is not "on-call," but "on-duty." These were duties assigned to Mr. Niazi by TSSI – it was all part of playing the part of an authentic Afghani government official. Mr. Niazi was required that he remain in character at all times, in order to provide a realistic vision of a "day in the life" in Afghanistan. At no point was Mr. Niazi off duty from that role. It was not a matter of being on call, waiting for a guest to arrive at a hotel and ring a buzzer for assistance: his assigned duties required the mental energy and fortitude to remain in character and alert at all hours, always ready for interrogation, while reenacting an Afghani government official's daily life. And, if Mr. Niazi is not entitled to all of the time he was assigned to the villages, there are hours worked for which he was uncompensated – for the nightly interruptions.

Defendant's motion must fail because it has failed to meet its burden to establish that there is no issue of triable fact as to which wage order applies, and because it has mischaracterized Plaintiff's claims.

### Summary of Facts

### I.    Mr. Niazi's Experience at Twentynine Palms

As the Court is aware, Plaintiff Niazi was a role player for TSSI. Niazi Decl., ¶ 2. During his employment, he was based out of the Forward Operating Base ("FOB"), but 70-80% of his time, he was sent on missions to a village outside of the FOB, where he was a "Key Leader," assigned the role of "Governor's Assistant" in the

"Governor's Center." *Id*. On those missions, Jan Niazi, civilian, ceased to exist. Instead, he was entirely immersed in the role: no longer Jan Niazi, civilian, but Ibrahim Sama, Governor's Assistant. *Id*., ¶ 2, see also Exh. 9 to Niazi Declaration, photo identification for Ibrahim Sama. TSSI gave Mr. Niazi the details to play the role. *Id*. He was not allowed to speak English – role players were only allowed to speak Farsi or Pashto, as the role required. *Id*., ¶ 3. Mr. Niazi's job was to simulate an authentic experience, the kind of experience that the Marines might encounter once deployed. *Id*.

For the entirety of the mission, he lived at the Governor's Center – sleeping, working, and eating his meals in the building. *Id*. There were 4 other people assigned to the Governor's Center – the Tea Men, Governor, and Bodyguard. *Id*. The Governor's Center residents ate their meals in the Governor's Center; TSSI did not allowed to eat in the Mess Hall. *Id*. Meal service was provided only twice a day, once in the morning and once in the evening. *Id*.

From the setup of the village to the amenities available, TSSI created a very realistic atmosphere of living in a war zone. It was a 24-hour combat training mission site. Niazi Decl, ¶ 7. Based in the middle of the desert, it faced very high temperatures in the day, and very low temperatures at night. *Id*., ¶ 8. There was no electricity – no lights, no air conditioning, no heat, no television, no radio. *Id*., ¶¶ 8-9. Mr. Niazi brought his own flashlight, but inevitably, the battery would die and he would be left without light once the sun went down. *Id*., ¶ 11. There were no bathrooms available in the building, but there were 4-6 bathroom stalls located approximately 40 feet outside the building. *Id*., ¶ 10. To leave he had to go through a strict procedure: Upon exiting the building, he was subject to a search, and then escorted by the role player "Afghani National Police;" upon his return, he was searched again. *Id*. At night, because it was so dark and because the Marines were still active, he did not feel safe to go outside. *Id*., ¶ 11.

//

//

His days were filled with a predictable routine. Anytime after 6:00 a.m., groups of Marines would start to show up, and examine him about certain situations that they were faced with – problems they were encountering, questions about cultural issues, people and their roles within the fictional community, etc., trying to get intel to proceed with their own mission. *Id.*, ¶ 12. TSSI would provide him with information about the roles and scenarios, which he would use to guide his interactions. *Id.* He would deal with one group of Marines, and shortly after that meeting ended, another would begin. *Id.* Such meetings would go throughout the day, ending very late in the evening. Id. Once the last Marines came in, the Tatitlek personnel left the facility. *Id.*, ¶ 13. It was Mr. Niazi's understanding that he was "off the clock," and that he could not claim these hours as hours worked. *Id.*, ¶ 13.

The village was as close to a war zone as possible. *Id.*, ¶ 14. Throughout the night, Marines were still working their mission. *Id.* From inside the Governor's Center, Mr. Niazi could hear the sounds of simulated shots being fired, bombs going off, Marines running up and down the stairs, and climbing on the roof. *Id.* Marines came to the Governor's Center throughout the night, searching for insurgents, conducting raids, or gathering information about what was happening outside. *Id.* The nightly interruptions were so frequent that he cannot give a specific number of interruptions he got, even on average. *Id.*, ¶¶ 5-6. He recalls being interrupted five or six times a night. *Id.* Because he was supposed to be creating a realistic combat zone for the Marines, he always had to be in costume and in role. *Id.*, ¶¶ 3-5.

Mr. Niazi complained to TSSI personnel about the nightly interruptions, the poor living conditions, and the difficulty getting any sleep at night. *Id.*, ¶ 15. Repeatedly, he was told "this is the mission, this is the job." *Id.* His understanding was that he either accepted these terms of employment or he quit. He was not told that he could or should keep track of all of his time that he was unable to sleep because of the mission, or that TSSI would pay him for that time. *Id.*

1     He would be presented with a timesheet at the end of the mission with the con-
2  tract hours printed in, and at times he added hours or days. *Id* But this was not for the
3  overnight interruptions, as he thought that time was non-compensable, and that if he
4  tried to get paid for that time, he would not be called back for another job. *Id.* At the
5  end of a mission, there would be 700 or 800 people, trying to get home.  *Id.*, ¶ 16.
6  Busses would be waiting, ready to go. *Id*. Everyone would line up to sign their time
7  sheets. *Id*. TSSI had approximately 5 employees to assist. *Id*. All of the role players
8  complained about the hours, which were pre-printed and often had nothing to do with
9  the reality. *Id*. Sometimes, role players were allowed to add a few hours, or a missing
10  day. *Id*. But, they were never allowed to claim an entire night. *Id*. Also, sometimes
11  Mr. Niazi would be told that more hours would be added, but his paychecks did not
12  reflect the extra hours. *Id*.

## II.   The Theater of War Created by Defendant

14     The Contract between Defendant and the USMC stated that Plaintiffs were to
15  act as "Foreign Language Specialists" and "Civilians On the Battlefield", insurgents,
16  terrorists, and other personnel encountered in the intended theater of operations." Fry
17  Decl., Exh. 1, Declaration of Joseph Koontz In Support of Tatitlek Support Services,
18  Inc.'s Motion for Summary Judgment in *Osman v. Tatitlek Support Services, Inc.*,
19  Central District of California case no. 2:15-cv-06044-SVW (JPRx), Filing no. 17-3, ¶
20  9 and pp. 15-27. The Statement of Work to the Contract also states that role players
21  were required to "support the language requirement for the exercise and/or act as in-
22  digenous village populace and officials to provide cultural and linguistic realism to the
23  training environments and scenarios." *Id.* Plaintiffs were also required to have "spe-
24  cialized roles" to compose the "general population" and play roles associated with
25  "municipal billets such as the local mayor, tribal sheik, bus driver and school teacher,"
26  "foreign Army personnel and foreign uniform police," and were required to engaged
27  in multiple battlefield simulations *Id.*, ¶¶ 9, 15 and pp. 15-27. This included requiring

28

role players to 'provide realistic wound simulations that give military medical personnel trauma care training under realist combat operations. *Id*. Defendant was also responsible for providing individuals of "youthful appearance . . . representative of the native populace of the intended theater of operation." *Id*. Under the contract, the role players were required to "replicate all aspects of a populated foreign municipality" and dress in "garb and uniforms while serving in their designated role." *Id.*

In addition, Defendant's former Director of Operations and Assistant Project Manager (two different positions), Joseph Koontz, who was responsible for managing Defendant's Role Player contracts for work performed for the USMC at Twentynine Palms, admits the Plaintiffs in this case were Role Players who engaged in "pre-deployment training exercises for the USMC." *Id.*, ¶¶ 3-4. As stated by Mr. Koontz, the type of work Plaintiffs engaged in consisted of demonstrating to the USMC what it would be like to live in Iraq or Afghanistan during a time of war. "The role players who worked at Twentynine Palms were engaged to assist in pre-deployment combat and cultural training for the USMC during a time of war, so that military personnel could be fully prepared for subsequent missions in Iraq and Afghanistan." *Id., ¶* 5. As part of their demonstrations, role players performed work in simulated villages that directly resembled the villages the USMC would encounter while in Iraq and Afghanistan. *Id., ¶* 11. The simulated villages provided 'day in the life' indigenous cultural training and were created to portray "multiple forms of highly realistic and authentic scenarios" that could be encountered during at time of war. *Id., ¶¶* 11, 13.

### III.   The Tatitlek Corporation

The Tatitlek Corporation is an Alaska native corporation. Fry Decl., Exh. 2, "Our History « The Tatitlek Corporation." According to its website, it has 11 subsidiaries. Fry Decl., Exh. 3, "Subsidiaries «  The Tatitlek Corporation." Its subsidiaries include a variety of industries – contracting, construction, management, and information systems, for example. *Id.* According to its website, TSSI, "through its division Ta-

tilek/FPTS provides a full range of services for realistic military pre-deployment train-

ing support services at several U.S. Army and U.S. Marine Corps installations. . . ."

*Id.* It classifies the following as "products": role players, development and delivery of

culture and language training, battlefield effects, medical trauma effects, servicing of

simulated weapons for training, and management/supervisory team. *Id.*

## IV.   Procedural History

After his employment with TSSI ended, Mr. Niazi filed a claim for wages with

the Office of the Labor Commissioner, who held a hearing and found in favor of Mr.

Niazi. Niazi Decl., ¶ 17. TSSI appealed the decision for a trial de novo. *Id.* There were

many other cases filed by other role players with the same procedural posture, and

also a class action, of which Mr. Niazi is an opt-out. *Id.* While there has been substan-

tial litigation in other cases, Mr. Niazi's was stayed fifteen days after filing, until only

recently when the Court lifted the stay. *Niazi v. Tatitlilek,* Filing no. 20. During that

interim time, the Court handled a number of issues – of most relevancy is the sum-

mary judgment in *Osman v. Tatitlek Support Servs., Inc.*, No. 215CV06044SVWJPR,

2017 WL 945024 (C.D. Cal. Mar. 1, 2017), which disposed of Osman's claims for on-

call time spent at the Forward Operating Base but left the time at the villages as an

open question.

After the Court's decision in *Osman*, 2017 WL 945024, most of the plaintiffs

settled their claims, but Mr. Niazi remains a hold-out, and wants his day in court. Ni-

azi Decl., ¶ 16. While the Court's analysis and application of the law in *Osman*, 2017

WL 945024 is likely inescapable before this Court, as of yet there is no order relating

specifically to Mr. Niazi's claims on the Forward Operating Base. However, Defend-

ant has filed this summary judgment motion only to address the time spent at the vil-

lages.

//

//

//

Opposition to Motion for Summary Judgment

1

**Summary Judgment Standard**

2    To get summary judgment, TSSI must "show[] that there is no genuine dispute

3  as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R.

4  Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

5  Whether a genuine issue of material fact is presented will be determined by asking

6  whether a reasonable jury could return a verdict for the non-moving party. *Id.* When

7  evaluating a motion for summary judgment, the facts are to be construed in a light

8  most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

9  *Corp.*, 475 U.S. 574, 587 (1986).

10

**Argument**

11  **I.    There is a dispute of material fact as to hours worked by Plaintiff.**

12    An employee must be compensated during all the time they are subject to

13  the control of the employer. Under Industrial Welfare Commission ("IWC") Wage Or-

14  der Nos. 4-2001 ("Wage Order 4") [ codified at Cal. Code Regs. tit. 8, § 11040] and 5-

15  2001 [codified at Cal. Code Regs. tit. 8, § 11050, at Section 2(K), "hours worked" is

16  defined as "the time during which an employee is subject to the control of the em-

17  ployer, and includes all the time the employee is suffered or permitted to work for the

18  employer, whether or not required to do so." This identical definition of "hours

19  worked" was considered by the California Supreme Court case, *Morillion v. Royal*

20  *Packing Co.*, 22 Cal. 4th 575, 582 (2000), *as modified* (May 10, 2000) *("Morillion").*

21    The *Morillion* court reasoned "[W]hen an employer directs, commands or re-

22  strains an employee from leaving the work place ... and thus prevents the employee

23  from using the time effectively for his or her own purposes, the employee remains

24  subject to the employer's control. According to [the definition of hours worked], that

25  employee must be paid." *Id.* at 583. Also, the *Morillion* court found that an employee

26  who is subject to the employer's control "does not have to be working during that time

27  to be compensated . . ." *Id.* at 582. Indeed, hours for which an employee has been

28  hired to do nothing or merely to wait for something to happen are hours subject to the

control of the employer and are thus hours worked. See *Armour & Co. v. Wantock*, 323 U.S. 126 (1944); see also *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

While Wage Order 5 (the "Public Housekeeping Industry" order) contains a narrow exemption for employees that are required to reside on the premises, such employees must still be paid for their assigned duties. Cal. Code Regs. tit. 8, § 11050, § 2(K). This means that for those times that an employee who is required to reside on the premises, an employer is not required to pay for those hours that the employee is not working. But, for those time that the employee does work, he must be compensated. While TSSI makes much of its instructions regarding the time sheets, they did not perform their most basic obligations – recording Mr. Niazi's hours worked and making sure that Mr. Niazi was paid appropriately for nightly disturbances. A brief perusal of the records provided by Defendant provide no indication whether the work was performed on the FOB or in the villages, and the vast majority of the additions are for entire new shifts – nothing which looks like the hours that Mr. Niazi worked overnight in the villages. Defendant never told Mr. Niazi to put those hours on his timesheets – instead, they told him simply that "this is the job."

Thus, whether it is compensation for all hours at the village or only for the nightly disturbances, there is a dispute of material fact as to the hours worked by Plaintiff which precludes summary judgment.

## II.     There is a dispute of material fact as to whether Plaintiff was instructed to record nightly disturbances.

Defendant argues that because Plaintiff had an obligation to record all hours worked, that his failure to do so precludes him from making any claim now. Def. Brf., 7:9-8:1. This is based on the Ninth Circuit decision in *Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981), as well as the Division of Labor Standards Enforcement policy manual. Defendant's reliance on *Forrester*, 646 F.2d 413 is misplaced. California Labor Code does not contain the same statutory language as the

federal Fair Labor Standards Act, and it does not include the same "suffered and per-mitted" requirement. *Washington v. Crab Addison, Inc.*, No. C 08-5551 PJH, 2010 WL 2528963, at *3 (N.D. Cal. June 18, 2010); *Varsam v. Lab. Corp. of Am.*, 120 F. Supp. 3d 1173, 1178 (S.D. Cal. 2015). Furthermore, this is not an attempt by the Plaintiff to obscure from the Defendant hours worked – these are hours that Defendant claims are non-compensable by their very nature. It was Defendant who created the village conditions and assigned Mr. Niazi to his role in the Government Center.

The Labor Code places an affirmative obligation on employers to maintain ac-curate records as to hours worked and wages paid. Cal. Lab. Code, § 226. TSSI failed to do this. TSSI's timesheets purport to do just that – but the company failed in one important aspect: although TSSI knew about the night work, and its personnel did not tell Plaintiff to record the hours as hours worked, let alone to account for the midnight meetings with the Marines. It was Defendant's own affirmative conduct that resulted in Plaintiff's failure to record overtime. The timesheets signed by Plaintiff reflected only the hours that Defendant deemed compensable – and Plaintiff understood that Defendant did not deem overnight hours compensable. He was told that "this is the mission" when he complained about the nightly disturbances or the conditions in the village. Take it or leave it was the message received. Therefore, it was Plaintiff's un-derstanding that he could not claim hours worked for those overnight hours.

**III.    There is a dispute of material fact as to the number and character of hours worked by Mr. Niazi.**

Defendant characterizes Plaintiff's claims as "on-call" hours, but the time spent at the base is best characterized as "on-duty." He was performing the assigned duty of playing the part of an Afghani government official. This is not a matter of an em-ployee being on-call, able to engage in personal activities in his own home, only act-ing in the event that his is called to perform. This is an employee who had to remain in costume and in character at all times, an employee who had to be so immersed in the role that he was prepared to be awoken by Marines sent to interrogate him at any time.

He lived, ate, breathed, and slept the mission – just like the Marines. There was no off-duty time for Mr. Niazi in the villages, no opportunity to relax and get out of role. For the time spent in the villages, Mr. Niazi was, for all intents and purposes, an Ibrahim Sama, an Afghani government official living in a war zone: a building with no amenities or electricity, subject to frequent searches, and with constant warfare being waged around him, 24-hours a day. Defendant calls this non-compensable on-call time – but from the facts presented by Plaintiff as to the conditions of employment imposed by Defendant, it is on-duty and should be compensated. TSSI hired Mr. Niazi to eat, sleep, and breathe as Ibrahim Sama – and he should be paid accordingly. An on-call analysis is not necessary.

The dispute over hours worked is not one purely of law, it is also of fact – the circumstances not just of the role players in general, but as to Mr. Niazi's treatment as an individual employee are relevant to the inquiry. The kind and character of work performed by Mr. Niazi in the villages is at issue. This fact is material and perhaps even ultimate - because if he did in fact perform work as an on-duty role player in character for his entire village experience, then he is entitled to wages. It is at the heart of the case. *Anderson*, 477 U.S. at 248. Mr. Niazi has the right to trial on his claim for wages. Summary judgment must be denied.

**IV.   There is a dispute of material fact as to which Wage Order applies.**

As the moving party, Defendant has the burden of production and persuasion that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Ambat v. City & Cty. of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Defendant has failed to meet this burden with regard to the application of the "Public Housekeeping Order."

As this is a trial de novo, there has been no application of a wage order to this case. Which wage order should apply is a disputed issue, one which precludes summary judgment.

## A. The Industrial Wage Orders are to be liberally construed.

In 1913, the California Legislature established the Industrial Welfare Commission, or IWC, and delegated to that agency the authority for setting minimum wages, maximum hours, and working conditions. *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 263 (2016), *as modified on denial of reh'g* (Mar. 15, 2017). A court must give effect to the purpose of the Legislature and the IWC when construing the Labor Code and the wage orders. *Id.* at 262. The courts have repeatedly characterized that purpose as the protection of employees "particularly given the extent of legislative concern about working conditions, wages and hours when the Legislature enacted key portions of the Labor Code." *Id.* To further that purpose, courts liberally construe the Labor Code and the wage orders to favor the protection of the employees. *Augustus*, 2 Cal. 5th at 262. Courts consider the interpretations of the (now-defunct) Industrial Welfare Commission the Division of Labor Standards Enforcement when applying the wage orders. *Id.*

## B. The Role Players are role players, an occupation governed by IWC Wage Order 4.

Plaintiffs are indisputably role players and the act of role playing is covered by Wage Order 4 as "demonstrators." The record is replete with references to the Plaintiffs role playing in simulated exercises for the benefit of Defendant's client, the United States Marine Corps ("USMC"). In two previous orders, the Court stated that Defendant and the USMC entered into a contract for work performed at the United States military base Twentynine Palms, California. The Court further stated:

> The Contract required the Defendant to furnish 'role players' for pre-deployment military combat training exercises. The training exercises were directed by the USMC who would create a Master Scenario Event List ('MSEL') that assigned duties to each role player. The role players were required to act as indigenous village populous and officials to provide cultural and linguistic realism to the training environments and scenarios. The primary purpose of

the role players was to simulate authentic experiences that the Marines might encounter during military operations in Iraq or Afghanistan.

*Osman*, 2017 WL 945024, at *1.

Furthermore, in addition to the Court's findings which establish that Plaintiffs were role players, Defendant's admissions support the same conclusion. TSSI's depiction of their training operations for Marines as "being in the business of" providing of meals and housing to the role players and marines is a mischaracterization of both what they were doing and to the industry that the wage order covers. What is undisputed is that TSSI was running war games for the military, creating a specific production for the Marines, relying on realistic role players and scenery for effect.

Wage Order 4 regulates the wages, hours and working conditions in the "Professional, Technical, Clerical, Mechanical and Similar Occupations." Wage Order 4 provides a long list of occupations covered by it including "demonstrators and display representatives." Cal. Code Regs. tit. 8, § 11040, Section 2(0). The Merriam-Webster Dictionary defines "demonstrator" as one who "demonstrates," such as a "product (such as an automobile) used to demonstrate performance or merits to prospective buyers." Fry Decl., Exh. 4. The Merriam-Webster Dictionary further defines "demonstrate" as "to illustrate and explain especially with many examples." Fry Decl., Exh. 5. Similarly, the American Heritage Dictionary defines "demonstrator" as "[o]ne that demonstrates, such as a participant in a public display of opinion," or "[a]n article or product used in a demonstration." Fry Decl., Exh. 6. The American Heritage Dictionary defines "demonstrate" as "to present by experiments, examples, or practical application; explain and illustrate . . ." Fry Decl., Exh. 7.

Here, it is undisputed by the plain meaning and unambiguity of Wage Order 4 that Plaintiffs are covered by Wage Order 4. Not only is it undisputed by the plain meaning, but it is further supported by the Court's findings and by Defendant's own admissions. Importantly, the Court's own orders found that Plaintiffs were role players who were required to act, or illustrate by example and practical application, life on an

Opposition to Motion for Summary Judgment

indigenous village in order to provide the USMC with a cultural and linguistic realism to the training environments and scenarios. In fact, the "primary purpose" of the role players was to "simulate authentic experiences that the Marines might encounter during military operations in Iraq or Afghanistan." *Id.* Consistent with the Court's orders and the plain meaning of Wage Order 4, the act of simulating authentic experiences was the type of job Plaintiffs, as demonstrators, were expected to execute.

Defendant's record is replete with additional types of examples employed by the role players, as demonstrators, to explain to the Marines what they may encounter in subsequent missions in Afghanistan and Iraq. Examples include requiring role players to act as foreign language specialists, insurgents, terrorists, and civilians. Role players were also required to demonstrate the roles of a local mayor, tribal sheik, bus drivers, school teachers, foreign army personnel and foreign police, as well as to provide realistic wound simulations that give military medical personnel trauma care training under realist combat operations. In this "theater of operations," as stated by Defendant, the product to be displayed or demonstrated to the buyer, *i.e.,* the Marines, was how the USMC could be prepared and familiar with a "day in the life" of the simulated villages Defendant created in order to portray "multiple forms of highly realistic and authentic scenarios" which the USMC could encounter in a time of war.

The plain meaning of Wage Order 4, Section 2(O) is clear and unambiguous. The "Professional, Technical, Clerical, Mechanical, and Similar Occupations," which covers Wage Order 4, includes the occupation of "demonstrators and display representatives." Role players were demonstrators whose primary purpose was to "simulate authentic experiences" to prepare the Marines for what they may encounter while on duty in Iraq or Afghanistan. A decision to the contrary would invalidate the plain meaning of Wage Order 4, which must be liberally construed for the protection of Plaintiffs. See *Augustus*, 2 Cal. 5th at 262. A decision to the contrary would also fail to give effect to the usual, ordinary import of the words "demonstrator and display

1    representative" in Wage Order 4, Section 2(0), making the language "mere surplus-

2    age." See *Singh v. Superior Court*, 140 Cal. App. 4th 387, 392 (2006).

3         If the language is clear and unambiguous, the courts must apply that language

4    and no further interpretation is required. *Id.*

5    ### C. It is unclear whether the Public Housekeeping Order applies.

6         IWC Wage Order 5 governs the "public housekeeping industry." It applies to

7    any business that provides meals, housing, or maintenance services, whether it is oper-

8    ated as a primary business or when incidental to other operations in an establishment

9    not covered by an industry order. Cal. Code Regs. tit. 8, § 11050, 2(P).

10        TSSI argues it is governed by Wage Order 5 because it provides meals, hous-

11   ing, and maintenance to the Marines and to the role players. The Wage Order 5 indus-

12   try examples are restaurants, bars, hotels, schools, veterinary clinics, and other busi-

13   nesses that share a common theme: they are service industries, or offer services to the

14   public. If selected portions of the wage order are read in isolation, TSSI's argument

15   makes sense. But, that is taking it far out of the context that the legislature and the In-

16   dustrial Welfare Commission intended when they crafted the order.

17        Here, this is government contract between an Alaska Native corporation and the

18   federal government, to present an elaborate war game in order to provide realistic

19   training to the Marines. It is not open to the general public, no person could walk off

20   the street and ask for a similar kind of service. That takes this squarely out of the

21   "public" realm. The IWC Wage Order was never intended to protect government con-

22   tractors, it was meant to protect workers. And a hotel manager residing on-site is a far

23   cry from role players bussed into the desert.

24        Further, if the statutory language of a wage order is ambiguous and susceptible

25   to more than one interpretation, the court can consider extrinsic aids such as the

26   DLSE's opinion letters. See *Singh*, 140 Cal. App. 4th at 393; *Rodriguez v. E.M.E.,*

27   *Inc.*, 246 Cal. App. 4th 1027, 1034–1035 (2016). The DLSE opinion letters, while not

28

1    controlling upon the courts, do "constitute a body of experience and informed judg-
2    ment to which courts and litigants may properly resort for guidance." *Rodriguez*, 246
3    Cal. App. 4th at 1034–1035.

4          Large businesses, such as Tatitlek, may conduct a variety of operations, and it
5    may seem as though different industry orders apply. Fry Decl., Exh. 8, "Which Wage
6    Order" pamphlet, created by the Division of Labor Standards Enforcement, pp. 4-5.
7    However, when those operations are part of the main business, only one will apply. *Id.*
8    The one caveat is the one that must be untangled here: when the housekeeping aspects
9    are incidental to the main purpose of the business. *Id.* Where there are distinct opera-
10   tions in a multi-purpose business, there may be a different industry order that applies –
11   it depends on whether they are operated for different business purposes, and whether
12   the management is separately organized. *Id.* By way of example, the DLSE states
13   "[w]here a concessionaire contracts to operate lodging or dining facilities, IWC Order
14   5 covers the concessionaire's business, but the rest of the enterprise (school or factory)
15   is classified otherwise. *Id.*, p. 5.

16         The declarations provided by Defendant appear to conflate Tatitlek Corporation
17   with the operations of TSSI, as though they are one in the same. However, it is en-
18   tirely possible that the various operations – from design to construction to mainte-
19   nance to the provision of workers – are done by other distinct operations of Tatitlek.
20   The record is not developed enough to render the conclusory statements an undisputed
21   fact.

22         Summary judgment would not be appropriate here for several reasons. Reasona-
23   ble inferences from the evidence must be viewed in favor of Plaintiffs. Here, there is
24   ample evidence to suggest that Wage Order 4 applies such that a reasonable jury could
25   return a verdict for Plaintiffs.

26   //

27   //

28   //

**V.    Even if Wage Order 5 applies, there is a genuine dispute as to whether all hours spent at the village are compensable.**

While Plaintiff maintains that Wage Order 4 is the appropriate order, even if it is not, a genuine issues of material fact exists – whether he was properly compensated for the overnight hours worked. The record as a whole will not lead a rational trier fact to automatically find against Plaintiffs.

As discussed above, Wage Order 5 contains a narrow exclusion for employees required to reside on the premises - only time spent carrying out duties is counted as hours worked. Cal. Code Regs. tit. 8, § 11050, 2(K). For example, in *Brewer v. Patel*, 20 Cal. App. 4th 1017 (1993), the court found that resident hotel managers need not be compensated for on-call time, even when required to be on site 24-hours per day. In that case, the court found that Brewer need only be compensated for time spent actually performing duties and not for time spent on call. *Id.*

There are some significant differences exist between Brewer and Niazi's work situation – First, Niazi was bussed onto the FOB and then further into the villages for mission-specific work. He did not live at the villages except for those brief missions that he was assigned to act as the Governor's Assistant. Also, the living circumstances for Brewer were much more hospitable. Brewer could leave the motel if he wished, but only had to let his employer know so that someone could take his place. *Brewer*, 20 Cal. App. 4th at 1019. Brewer was given a one-bedroom apartment, and when he was not working, he could relax in his apartment – watching television or attending to his own personal needs. Id. Essentially, after the office hours, he went home and only had to leave if a customer required assistance. That is distinctly different than Niazi's situation: in authentic Afghani garb, in role in the desert, with no electricity, no bathroom, getting frisked upon entering or leaving the compound, with the constant threat of interrogation by the Marines over his head, and with gun shots and fighting going on all around. This was not his residence, and he was not on-call. This was 100% active duty work, for which he should be compensated.

Mr. Niazi's assigned duties were extremely intrusive and pervasive: he was a key player in the creation of a realistic simulation of an Afghan village. He was required to act the part of a Governor's Assistant for the entire time that he was in the village. He dressed, spoke, slept, and ate as an Afghani government official in an Afghan village. In this way, he illustrated by example and practical application the life in an indigenous village with cultural and linguistic realism – the biggest and most important part of the operations at Twentynine Palms. After all, his primary purpose was to simulate an authentic experience, the kind of experience that the Marines might encounter once deployed. Mr. Niazi's playing the part of a Governor's Assistant, even while sleeping, was part of his assigned duties. This is demonstrably different than the facts in *Brewer v. Patel*. These hours were certainly compensable, whether using Wage Order 4 or 5 to guide the analysis. On this basis, Defendant's motion for summary judgment must fail.

## Conclusion

For the foregoing reasons, Plaintiff Jan Niazi asks that this Court deny Defendant's motion for summary judgment in its entirety.

Dated: January 8, 2018                    Respectfully submitted,

/s/_____
Jessica Fry
Attorney for Plaintiff Jan Niazi